1
2
3
4
5

UNITED STATES DISTRICT COURT

6

EASTERN DISTRICT OF WASHINGTON

7  DENNIS KING and TRICIA KING,
   husband and wife,

8                                                NO:  12-CV-0622-TOR

                          Plaintiff,

9                                                ORDER RE: PENDING MOTIONS

10        v.

11 GARFIELD COUNTY PUBLIC
   HOSPITAL DISTRICT NO. 1, a
   municipal corporation, et al.,

12
                          Defendant.
13

14        BEFORE THE COURT are Defendant Terrence McGee, M.D., and Jane

15 Doe McGee's Motion for Summary Judgment (ECF No. 60); and Defendants

16 Garfield County Hospital District No. 1, Blaine Beehler, Michele Beehler, Andrew

17 Craigie, and Barbara Craigie's Motion for Summary Judgment (ECF No. 70),[1]

18 _____

19 [1] ECF No. 70 includes corrected citations and appears to supersede the motion for

20 summary judgment filed at ECF No. 63.

ORDER RE: PENDING MOTIONS ~ 1

Motion to Strike Statement of Facts (ECF No. 86), Motion to Shorten Time to Hear Motion to Strike (ECF No. 97), and Motion to Expedite (ECF No. 96). This matter was heard with oral argument on April 16, 2014. Ronald Van Wert and Jeffrey Galloway appeared on behalf of the Plaintiff. Susan Troppman appeared on behalf of Defendants Craigie, Beehler, Morrow, and Garfield County Public Hospital District No. 1. Mark Louvier appeared on behalf of Defendant Dr. McGee. The Court has reviewed the briefing and the record and files herein, and is fully informed.

## BACKGROUND

This case concerns a hospital employee's termination for alleged drug diversion and use after the employee tested positive in a drug test. Plaintiff Dennis King sued his former employer, Garfield County Hospital District No. 1 and hospital employees (collectively, "GCHD"), as well as a company and physician allegedly involved in the drug test. GCHD and the physician here move for summary judgment on the claims against each.

## FACTS

Plaintiff Dennis King, a registered nurse, was employed with Defendant GCHD prior to the termination forming the basis for the instant lawsuit. Pl.'s Statement of Facts, ECF No. 73 at 2. At the time of the events in question, Defendant Andrew Craigie was the GCHD's Chief Executive Officer; Defendant

Michele Beehler was Human Resources Director; Susan Morrow was Chief Nursing Officer; and Barbara DeHerrera was Long-Term Care Manager and King's direct supervisor. *Id*. at 3.

On February 1, 2011, a Tuesday, King had a tooth extracted, which resulted in a painful bone spur for which his dentist prescribed Tylenol #3 with codeine. ECF No. 73 at 4; King Depo. at 36:9-11. The prescription dosage was 300 milligrams of acetaminophen and 30 milligrams of codeine; the prescription indicated that King could "take 1 or 2 tablets by mouth every 4-6 hours as needed for pain." ECF No. 73-6; Pl.'s Statement of Facts, ECF No. 73 at 5.

King worked a 12-hour weekend day shift, making his regularly scheduled working days Saturday, Sunday, and Monday, starting at 7 a.m. ECF No. 73 at 4. He worked his regularly scheduled shifts on February 5, 6 and 7. Pl.'s Statement of Facts, ECF No. 73 at 5; King Depo. at 41:12-15.

Medications dispensed to GCHD patients are documented in the "medication administration report." Pl.'s Statement of Facts, ECF No. 73 at 6; King Depo. at 48:15-24.  Procedure dictated that when staff members administering medication would pull the dose from the locked medication cart or cabinet, they would record the amount that should be remaining after the dose was removed. King Depo. 47:1-47:24, ECF No. 68-1 at 13. The staff member signs the medical administration record. King Depo. 48:23-48:24, ECF No. 68-1 at 14. Nurses also perform a

narcotic count at the end of each shift and sign to indicate who is responsible for the count. Morrow Depo. 61:16-61:24, ECF No. 68-3 at 8.

During his shifts on February 5 and 6, King gave four doses of morphine each day; on February 7, he administered one dose. King Depo. 55:18-56:3, ECF No. 68-1 at 16-17. King's last signature on the morphine sulphate log is for February 7 at 8 a.m. Morrow Depo. 48:5-48:11, ECF No. 73-2 at 18. Another staff member, Ms. Jilek, signed out morphine sulphate doses at 8 p.m. and 11:15 p.m. on February 7, and at 2 a.m. and 5:15 a.m. on February 8. Morrow Depo. 50:14-51:12, ECF No. 73-2 at 19-20. At the end of his shift on February 7, at 7:30 p.m., King's signature appears on the narcotic count log. King Depo. 56:3-57:19, ECF No. 68-1 at 17-18.

The next day at 7 a.m., another nurse, Ms. Bell, notified King's supervisor Barbara DeHerrera that there was a discrepancy; DeHerrera then notified Morrow. Morrow Depo. 66:12-66:22, ECF No. 68-3 at 9.  Bell had discovered a 19 milliliter overage in the morphine sulphate bottle; the doses accounted for indicated that the remaining medication should be 15 milliliters, but the actual amount in the bottle of morphine was 34 milliliters. Morrow Depo 55: 23-56:6, ECF No. 62-2 at 7.

GCHD did not test the morphine to determine whether it had been diluted; rather, the bottle of morphine was returned to the manufacturer, where it was destroyed. Morrow Depo. 56:18-56:25, 57:22-57:23, ECF No. 62-2 at 7.

After his shift ended on February 8, King was not scheduled to work for several more days. On February 8, 9, and 10, King ingested between two and four tablets of Tylenol #3 with codeine each day. Pl.'s Statement of Facts, ECF No. 73 at 9. He received a call on the evening of February 10 informing him that a mandatory meeting would take place at GCHD the next day. *Id*. On February 11, a scheduled day off for King, King took one tablet of Tylenol #3 with codeine before attending the mandatory meeting. *Id*. at 9-10.

When King arrived at GCHD he was informed that the mandatory meeting was a drug test and the employees were required to submit a urine sample for analysis. *Id*. Morrow informed the employees that the drug testing was in response to a discrepancy in the narcotic count. Morrow Depo. 77:19-78:11, ECF No. 73-2 at 32-33. Morrow indicated that King showed no signs of drug use or impairment. Morrow Depo. 79:20-82:9, ECF No. 73-2 at 34-36.

The drug test was conducted by QCL, Inc. Pl.'s Statement of Facts, ECF No. 73 at 13. QCL contracted with OHS Health & Safety Services for medical review officer professional services. See Exhibit 11, ECF No. 73-11 at 2. Defendant Dr. Terrence McGee was the medical review officer responsible for interpreting the test results, and interpreted King's test results. Morrow Depo. 19:9-13, ECF No. 62-2 at 4; Exhibit 11, ECF No. 73-11 at 5; Pl.'s Statement of Facts, ECF No. 73 at 15.

ORDER RE: PENDING MOTIONS ~ 5

On February 18, Morrow called King and informed him that the test results had shown that his morphine levels were very high, that he was being put on leave, that he could not come into work, and that there would be a meeting on February 22 to discuss. King Depo. 88:3-88:23, ECF No. 68-2 at 1. King requested that Dr. McGee be present at the meeting. Pl.'s Statement of Facts, ECF No. 73 at 17.

During the February 22 meeting, Beehler, DeHerrera and Morrow were present from GCHD, and Dr. McGee appeared telephonically. Pl.'s Statement of Facts, ECF No. 73 at 17. King brought the prescription bottle containing his remaining tablets of Tylenol #3 with codeine. Pl.'s Statement of Facts, ECF No. 73 at 18. Though disputed, King states that Dr. McGee told him that his urinalysis produced near fatal levels of morphine and contained a trace of codeine. Pl.'s Statement of Facts, ECF No. 73 at 19. King told Dr. McGee that he had taken a tablet of Tylenol #3 on the morning of the drug test. Pl.'s Statement of Facts, ECF No. 73 at 19. King claims that Dr. McGee never asked him how many doses he had taken. Pl.'s Statement of Facts, ECF No. 73 at 19-20. At the time of the meeting, Dr. McGee does not appear to have submitted a report with the results of King's urinalysis.

A February 25, 2011 report from OHS, signed by Dr. McGee, indicates King's urinalysis test as negative. Pl.'s Statement of Facts, ECF No. 73 at 21. McGee claims this was signed (with a stamp) and sent without his authority. Pl.'s

Statement of Facts, ECF No. 73 at 21. On February 28, 2011, Dr. McGee wrote

and email that was sent on to Morrow stating that

> While the Rx explains the _presence_ of the drugs…the levels are in my opinion likely abusive levels…in DOT type testing an opiate level above 15,000 ng/mL shifts the burden of proof from the doctor to the donor. Mr. King needs to provide some reasonable explanation for these levels.

Exhibit 18, ECF No. 73-18 (emphasis in original).

　　　Codeine metabolizes into morphine. Richard Barclay, Ph.D Depo., ECF No. 73-13 at 3. Plaintiffs' expert testified that the results of King's drug test were not consistent with the use of morphine suspected to be diverted from the hospital because the codeine and morphine ratio was much higher than would be expected had morphine been used in addition. _Id_. at 3. The expert stated that "the amount of codeine and morphine found in that sample taken on that morning [of the drug test administered by GCHD] is a result of multiple doses and sequential doses of codeine, not from a single tablet." _Id_. at 6. He also testified that Dr. McGee's finding that King's dose was "near fatal" was "way out of line." _Id_. at 5.

　　　GCHD terminated King March 29, 2011. Exhibit 25, ECF No. 73-25. The termination letter informed King that his "termination is the result of failure to comply with section 3.16 of the employee handbook Substance Abuse and Testing." _Id_. The letter further provided that "The reasonable suspicion test was

performed on 2/11/11 was found to have positive test results for Opiates of

Codeine and Morphine." *Id*.

An unemployment benefits hearing was conducted on June 22, 2011. Pl.'s

Statement of Facts, ECF No. 73 at 26, 31. For the hearing, Dale Tuvey on behalf of

GCHD submitted a response to King's request for benefits, in which he stated that

> We believe that the most likely explanation of what happened here and that is consistent with all the evidence in this case is that Mr. King did indeed take morphine from the bottle used for the patient for whom he cared, and that he did have high levels of morphine in his system that could only be explained by his having taken high levels of morphine, certainly more than contained in one Tylenol 3 tablet. The "near fatal" levels in his urine as described by Dr. McGee could only have been found in someone taking large quantities of the drug, possibly over a significant period of time.

ECF No. 73-30.

Under GCHD's drug policy set forth in its employee handbook,

> Employees are prohibited from the illegal use, sale, dispensing, distribution, possession, or manufacture of illegal drugs, controlled substances, narcotics, or alcoholic beverages on GCHD premises or work sites, in addition, GCHD prohibits the off-premise abuse of alcohol and controlled substances as well as the possession, use, or sale of illegal drugs, when those activities adversely affect job performance, job safety or GCHD's reputation in the community.

ECF No. 66-1 at 7. The policy further provides:

> Reasonable suspicion testing: Employees shall submit to a drug and/or alcohol test when the employer reasonably suspects that this Policy may have been or is presently being violated. A referral for testing will be based on current, clearly described observations. Such referrals will be made by management/supervisory personnel of an employee showing signs and symptoms of drug and alcohol use and confirmed by a second supervisor or

ORDER RE: PENDING MOTIONS ~ 8

manager. When reasonable suspicion exists, the affected employee will be
questioned and observed. A decision to request a specimen will be based on
eyewitness reports, facts of the event and observed physical and behavioral
characteristics of the affected employee. The employee will be interviewed
in a private area.

ECF No. 66-1 at 10.

Positive test results: If the result of a drug or alcohol test under this policy is
positive, the test will be reviewed by a physician/provider who will
determine if the positive test I s the result of the employee's legitimate and
authorized prescription medication. The physician/provider will notify the
employee and the employer of his/her finding in writing. If the positive test
is determined to be the result of a legitimate and authorized prescribed
medication, it is not the intention of the employer to request specific
information about the prescription unless it is likely that the effects of the
medication would compromise safety in the workplace.

ECF No. 66-1 at 11.

MOTIONS FOR SUMMARY JUDGMENT

**A. Legal Standard**

Summary judgment may be granted to a moving party who demonstrates

"that there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party

bears the initial burden of demonstrating the absence of any genuine issues of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then

shifts to the non-moving party to identify specific genuine issues of material fact

which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986). "The mere existence of a scintilla of evidence in support of the

1   plaintiff's position will be insufficient; there must be evidence on which the jury

2   could reasonably find for the plaintiff." *Id.* at 252.

3         For purposes of summary judgment, a fact is "material" if it might affect the

4   outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any

5   such fact is "genuine" only where the evidence is such that a reasonable jury could

6   find in favor of the non-moving party. *Id.* In ruling upon a summary judgment

7   motion, a court must construe the facts, as well as all rational inferences therefrom,

8   in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372,

9   378 (2007). Only evidence which would be admissible at trial may be considered.

10  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

11  **B. Defendant McGee's Motion for Summary Judgment (ECF No. 60)**

12        Defendant McGee moves for summary judgment dismissal of the claims

13  against him, arguing that he did not owe a legal duty to Mr. King, nor was any duty

14  allegedly breached. ECF No. 60 at 4. He also contends that Plaintiffs lack the

15  requisite expert witness testimony causally relating any injuries to Dr. McGee's

16  alleged negligence. ECF No. 60 at 9.

17        1.  <u>Whether Dr. McGee Owed a Legal Duty to Plaintiffs</u>

18        Defendant Dr. McGee contends that Plaintiffs alleged a health care

19  negligence cause of action against him under RCW 7.70, *et seq*., because they

20  allege that he negligently performed the drug testing, analysis and interpretation.

ORDER RE: PENDING MOTIONS ~ 10

ECF No. 60 at 4. Defendant contends that under this standard, Plaintiffs' claim fails because Dr. McGee did not owe Mr. King a duty of care because he did not injure him or fail to warn him of an injury; Defendant contends that his only duty is to properly report to GCHD. ECF No. 60 at 4-8. Plaintiffs counter that Dr. McGee's liability to King is based on common law negligence, not medical negligence. ECF No. 75 at 3. Plaintiffs contend that whether a duty exists at common law depends on the foreseeability of the risk created. *Id*.

The question before the Court, then, is what standard applies when an employee alleges that a medical review officer negligently interpreted results of a drug test administered by an employer, resulting in the employee's termination. No Washington case directly addresses this issue. The Court accordingly turns, as it must, to the language of the statute. The Washington statute on actions for injuries resulting from health care sweeps broadly:

> The state of Washington, exercising its police and sovereign power, hereby modifies as set forth in this chapter and in RCW 4.16.350, as now or hereafter amended, certain substantive and procedural aspects of all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for *injury occurring as a result of health care*....

RCW § 7.70.010 (emphasis added). Thus, "whenever an injury occurs as a result of health care, the action for damages for that injury is governed exclusively by RCW 7.70." *Branom v. State*, 94 Wash. App. 964, 969 (1999). However, "[s]tatutes such as the medical malpractice act that are in derogation of the common law[] must be

1    construed narrowly." *Sherman v.* Kissinger, 146 Wash. App. 855, 865-66 (2008).

2    In determining the scope of the phrase "health care," Washington courts have

3    construed it to mean "the process in which [a physician is] utilizing the skills

4    which he had been taught in examining, diagnosing, treating or caring for the

5    plaintiff as his patient." *Branom*, 94 Wash. App. at 969-70.

6         Defendant contends that case law mandates applicability of the medical

7    negligence statute, citing *Eelbode v. Chec Medical Centers, Inc.*, 97 Wash. App.

8    462 (1999), and *Daly v. United States*, 946 F.2d 1467 (9th Cir. 1991). The Court

9    disagrees, as both cases are distinguishable from the instant factual scenario. *See*

10   *Daly*, 946 F.2d 1467 (holding that a radiologist interpreting an x-ray from a pre-

11   employment physical at the behest of an employer had a duty to inform the

12   applicant of an abnormality in the lung, despite the fact that there was no

13   physician-patient relationship); and *Eelbode*, 97 Wash. App. 462 (holding that

14   physical therapist performing pre-employment health exam owed a duty of care for

15   injuries incurred during the course of the exam). In these cases, where the court

16   found liability under RCW 7.70, *et seq.*, the question centered on the relationship

17   between the health care provider and the plaintiff; the provision of health care—in

18   interpreting x-rays that found a lung mass, and determining if an employee was

19   physically capable of performing her job, for example—did not appear to be in

20   dispute.

ORDER RE: PENDING MOTIONS ~ 12

1    Here, in contrast, there is no suggestion that Dr. McGee provided any health

2    care to King. Rather, the undisputed evidence indicates that Dr. McGee worked for

3    a company (OHS) that was engaged by another company (QCL) that was engaged

4    by King's employer (GCHD) to interpret –from California—the results of a drug

5    test from a nurse in rural Washington State. Neither party has suggested that Dr.

6    McGee diagnosed or treated King, or had reason to know of King's health status

7    other than as related to a single urinalysis solely intended to identify drug use.

8    Under its plain language, the statute applies to "causes of action…for damages for

9    injury occurring as a result of health care…." *See* RCW 7.70.010. This definitional

10   application of the term "health care" is supported in other cases. *See Hines v. Todd*

11   *Pac. Shipyards Corp*., 127 Wash. App. 356, 374 (2005) ("It is undisputed that the

12   purpose of the drug screening test was not health care or medical treatment," in the

13   context of the Health Care Disclosure Act, RCW 70.02 ).[2] For these reasons, RCW

14   7.70 does not apply in this instance.

15       The Court next considers common law negligence. Under general

16   negligence principles, "A duty of care is necessarily limited to the level of care that

17   [2] Defendant, after claiming that RCW 7.70 applied to the instant case, immediately

18   claimed that he could not be liable under the statute for several reasons, including

19   because Washington courts have recognized that employment-related drug tests are

20   not healthcare, citing *Hines*, 127 Wash. App. 356. ECF No. 60 at 8.

ORDER RE: PENDING MOTIONS ~ 13

is reasonable in the particular circumstances." *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.,* 170 Wash. 2d 442, 455 (2010). Washington courts have held that, for example, "the measure of reasonable care for an engineer undertaking engineering services is the degree of care, skill, and learning expected of a reasonably prudent engineer in the state of Washington acting in the same or similar circumstances." *Id*. Here, a similar standard is appropriate:  the measure of reasonable care for an interpreter of drug tests is the degree of care, skill, and learning expected of a reasonably prudent drug test interpreter in the State of Washington acting under the same or similar circumstances.

Here, the Court finds that there is a question of material fact as to whether Dr. McGee was negligent. Plaintiffs point out that, in the meeting to discuss urinalysis results, Dr. McGee told GCHD that King had near-fatal morphine levels. King Depo. at 99:21-22, ECF No. 73-5 at 25. However, Plaintiffs' medical review officer indicates that "one cannot determine the drug dose based on the urine concentration from a workplace test result." ECF No. 73-14 at 6. Plaintiffs' MRO also indicated that Dr. McGee, if following standard procedure, should have taken into account the valid, recent prescription for Tylenol with codeine. *Id*. Thus, there is at least a question of fact as to whether Dr. McGee breached his duty to Plaintiff.

Defendant next argues that Plaintiff's negligence claim against Dr. McGee fails for want of proximate cause. ECF No. 87 at 8. Defendant contends that

1  Plaintiffs' theory that King was terminated as a result of Dr. McGee's

2  pronouncement that the drug test was positive fails because Dr. McGee did not

3  have the authority to terminate King and GCHD was free to disregard Dr. McGee's

4  analysis. *Id*. at 10. Defendant contends that King alleges that if he had been given a

5  *Loudermill* or name-clearing hearing, he would not have been terminated. *Id*.

6      First, the Court disagrees with Defendant's reading of Plaintiffs' complaint.

7  Plaintiffs do not give up a claim that Dr. McGee's negligence resulted in King's

8  termination simply because they claim that King was constitutionally entitled to a

9  name-clearing hearing. Those two arguments are not mutually exclusive. Even if

10  Dr. McGee interpreted the urinalysis without any negligence, King's constitutional

11  rights with respect to his public employer are not affected.

12      Legal causation "rests on policy considerations as to how far the

13  consequences of defendant's acts should extend.  It involves a determination of

14  whether liability *should* attach as a matter of law given the existence of cause in

15  fact." *Hartley v. State*, 103 Wash.2d 768, 779 (1985) (emphasis in original).  This

16  is a question of law to be decided by the court rather than by a jury.  *Colbert v.*

17  *Moomba Sports, Inc.*, 163 Wash.2d 43, 51 (2008).  The primary focus of the legal

18  causation analysis "is whether, as a matter of public policy, the connection

19  between the ultimate result and the act of the defendant is too remote or

20  insubstantial to impose liability." *Michaels v. CH2M Hill, Inc.*, 171 Wash.2d 587,

611 (2011) (quotation and citation omitted).  This inquiry "depends upon mixed considerations of logic, common sense, justice, policy and precedent." *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wash.2d 190, 204 (2001) (quotations and citations omitted).

Common sense dictates that a medical review officer's misreporting of drug test results could have serious consequences for the employee's continued employment. Such a result is not too remote or insubstantial to impose liability. Dr. McGee interpreted the urinalysis as part of an employer's testing of an employee. That the employee could lose his job as a result of a negligently performed interpretation is foreseeable. For these reasons, Defendant's motion for summary judgment on this issue fails.

2.  Whether Plaintiffs Require Expert Witness Testimony Causally Relating Injuries to Dr. McGee's Alleged Negligence

Defendant next contends that Plaintiffs have failed to allege sufficient causal connection between the negligence alleged against Dr. McGee and that expert medical testimony is required on the issue of proximate cause. ECF No. 60 at 10. Defendant contends that "the causal relationship of the alleged negligence of the defendants to the resulting condition of the [plaintiff] must be established by medical testimony beyond speculation and conjecture." *Young v. Group Health*, 85 Wash. 2d 332, 340 (1975). While this is likely true of medical negligence cases

involving medical treatment and resulting *physical* conditions, that is not the case here. The negligence alleged against Dr. McGee did not result in an injury that requires a doctor to explain.

**C. Defendant GCHD's Motion for Summary Judgment (ECF No. 70)**

Defendants Garfield County Public Hospital District No. 1, Susan Morrow, Andrew Craigie, and Michele Beehler (collectively "GCHD") move the court for summary judgment dismissal of Plaintiffs' claims. They argue that the drug test was a reasonable search under the Fourth Amendment, and thus that constitutional claim fails. They argue that King's claim that he was deprived of a liberty interest in his employment without due process fails because he has not met the standard described in case law. They also contend that, even if the Court is disinclined to grant their motion for summary judgment on these grounds, the individual officials are entitled to qualified immunity for their actions. They further argue that King's state law claims fail.

> 1. Whether GCHD's Drug Test Was Reasonable Under the Fourth Amendment

Plaintiffs' Second Amended Complaint alleges in a 42 U.S.C. § 1983 claim that GCHD's drug testing was an unreasonable search in violation of the Fourth Amendment. ECF No. 33 at 15. GCHD moves for summary judgment on this claim, arguing that the decision to test was supported by reasonable suspicion, that

the nature of Mr. King's job warranted suspicionless testing, and that GCHD's interest in protecting the health and safety of its patients outweighs King's privacy interest. ECF No. 70 at 2-7.

"[T]he Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer...." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). "[U]rinalysis drug tests necessarily invade reasonable expectations of privacy rendering them searches within the meaning of the Fourth Amendment." *Am. Fed'n of Gov't Employees, AFL-CIO, Local 2391, (AFGE) v. Martin*, 969 F.2d 788, 791 (9th Cir. 1992) (citing *Von Raab*, 489 U.S. at 665. The warrant and probable cause requirements of the Fourth Amendment, however, do not necessarily apply in the drug testing context. *AFGE*, 969 F.2d at 791. Rather, whether the government may validly require its employees to submit to drug testing is determined "'by balancing its intrusion on the [employees'] Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 619 (1989) (quoting *Delaware v. Prouse,* 440 U.S. 648, 654 (1979)). "When the balance of [these] interests precludes insistence on a showing of probable cause, ... 'some quantum of [reasonable or] individualized suspicion' " generally must be shown before a search may be deemed reasonable under the Fourth Amendment. *AFGE*, 969 F.2d at 791-792 (quoting *Skinner*, 489

1    U.S. at 624). "Where the government has a legitimate public health and safety or

2    national security interest in confirming whether an employee is using illegal drugs

3    on- or off-duty, the existence of reasonable suspicion weighs in favor of finding

4    that a resulting search is reasonable." *Id.*  (citing *Skinner*, 489 U.S. at 624;

5    *O'Connor v. Ortega,* 480 U.S. 709, 726 (1987).

6         Here, the government hospital's interest in protecting its patients is a

7    "legitimate public health" interest in "confirming whether an employee is using

8    illegal drugs"; in such a case, "the existence of reasonable suspicion weighs in

9    favor of finding that a resulting search is reasonable." *See AFGE*, 969 F.2d at 791-

10   792. legitimate regulation."). Undisputed facts support a finding of reasonable

11   suspicion to drug test King. He had recent access to the morphine vial that GHCD

12   officials suspected had been tampered with. *See* Pl.'s Statement of Facts, ECF No.

13   73 at 6. He had administered the morphine to a patient the morning before the

14   discrepancy was noted. *Id*. He had performed the narcotics count the evening

15   before. *Id*. King was told that the drug test was being performed because of a

16   suspected diversion based on a discrepancy in the narcotics count. *Id*. at 10. While

17   these circumstances may not be those enumerated in GCHD's employee handbook

18   drug testing policy, they are certainly circumstances giving rise to reasonable

19   suspicion to test for drug use, particularly for a public hospital charged with

20   maintaining the safety of its patients and the security of its medications.

The Court is unpersuaded by Plaintiffs' contention that GCHD's drug testing policy in its handbook "established Mr. King's expectation of privacy and provided the safeguards to protect his constitutional rights." ECF No. 77 at 6. GCHD's employee handbook provides that "Employees shall submit to a drug…test when the employer reasonably suspects that this policy may have been…violated." ECF NO. 66-1 at 10. The policy states that a "decision to request a specimen will be based on current, clearly described observations," that incident testing will take place within 24 hours of the incident, for example. *Id*. at 10-11. The undisputed facts indicate that no one from GCHD believed King exhibited physical indications of narcotic use, and that King was tested three days after the discrepancy was discovered. Plaintiffs contend that because GCHD did not comply with its own policies in administering the drug test, King's reasonable expectation of privacy was violated because a public employee's expectation of privacy may be reduced or enhanced by the practices and procedures of the employer. ECF No. 77 at 4. However, a company's policy cannot itself set the parameters of Fourth Amendment reasonableness. Plaintiffs claim that *AFGE v. Martin*, 969 F.2d 788, stands for the proposition that the Ninth Circuit's holding that the drug test did not violate the employee's constitutional rights was based on the premise that the employer followed its own policy in conducting the drug test. ECF No. 77 at 5. However, *AFGE* concerns a facial challenge to a public employer's drug testing

plan, 969 F.2d at 791; thus, Plaintiffs' argument that the court found the employer did not violate an employee's constitutional rights because the employer followed its own policy is inaccurate, since the court did not consider the policy as applied to any factual situation. *See AFGE*, 969 F.2d at 793.

Plaintiffs also cite *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987), for the proposition that practices and procedures can alter the employee's reasonable expectation of privacy. ("The employee's expectation of privacy must be assessed in the context of the employment relation"; "Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation."). While this arguably could be extended to the realm of drug testing, the Court notes that the handbook does establish an expectation that drug testing may be ordered. *See* ECF No. 66-1 at 7 ("Employees believed to be under the influence of drugs, narcotics, or alcohol will be required to leave the premises or may be asked to take a drug or alcohol test.").

In other words, the Court finds no compelling support for Plaintiffs' suggestion that Fourth Amendment protections are coextensive with the employee handbook's drug testing policy. Accordingly, Defendant's motion for summary judgment on this issue is granted.

///

ORDER RE: PENDING MOTIONS ~ 21

2.  <u>Fourteenth Amendment Claim</u>

Plaintiffs' Second Amended Complaint alleges that King "had a liberty interest in his name and reputation" and that as a public employee he was "entitled to" and not offered "a hearing giving him an opportunity to clear his name prior to termination from GCHD." ECF No. 33 at 16. Plaintiffs further allege that this failure to provide name-clearing hearings was an "official policy." *Id*. Defendants GCHD contend that this § 1983 due process claim fails because (1) the allegedly stigmatizing statements made about him have not prevented him from obtaining employment as a nurse; (2) a name clearing hearing is required only if an employee alleges the employer's statements were "substantially false"; (3) statements made during King's unemployment hearing were not made in the course of his termination; (4) King was not denied an opportunity to clear his name prior to termination; and (5) King could have requested a post-termination name-clearing hearing but did not do so. ECF No. 70 at 9-14.

The Fourteenth Amendment's guarantee of procedural due process applies when a constitutionally protected property[3] or liberty interest is at stake. *See*

---

[3] Plaintiffs refer to a "*Loudermill* hearing" several times, citing the type of hearing constitutionally prescribed in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). The Court notes that *Loudermill* concerned pretermination hearings in employment in which a plaintiff had a *property* interest. *Id*. at 537. A property

*Vanelli v. Reynolds Sch. Dist. No. 7,* 667 F.2d 773, 777 (9th Cir. 1982). Where the State seeks to bar forever an individual from public employment, makes a charge of "dishonesty," or attaches a "stigma" to an employment decision, it must afford due process. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573 (1972). But mere harm to reputation alone is insufficient to implicate an individual's liberty interest. *Paul v. Davis*, 424 U.S. 693, 711-712 (1976). "[D]ue process protections will apply if 1) the accuracy of the charge is contested; 2) there is some public disclosure of the charge; and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Llamas v. Butte Cmty. Coll. Dist.,* 238 F.3d 1123, 1129 (9th Cir. 2001). "Failure to provide a 'name-clearing' hearing in such a circumstance is a violation of the Fourteenth Amendment's due process clause." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004). Placing the stigmatizing information in the employee's personnel file, "in the face of a state statute mandating release upon request, constitute[s] publication sufficient to trigger [the employee's] liberty interest under

_____

interest is created by, for example, state law that indicates that the employee cannot be terminated except for good cause. *Id*. Plaintiffs here refer to King's "liberty interest" in his job, which arises in the circumstances enumerated above. ECF No. 33 at 16. And Plaintiffs make no clear argument that King had a property interest in his job for which he was an at will employee, other than to cite *Loudermill*.

ORDER RE: PENDING MOTIONS ~ 23

1   the Fourteenth Amendment." *Cox v. Roskelley*, 359 F.3d at 1112.  In such a case,

2   "[t]he lack of an opportunity for a name-clearing hearing [would violate a

3   plaintiff's] due process rights." *Id.*

4        The Court addresses each of Defendants' specific contentions in turn.

5        *1.  Whether King Has Been Prevented From Obtaining Employment*

6        Defendants contend that King cannot show that his dismissal destroyed his

7   ability to take advantage of employment opportunities in his field because he was

8   able to obtain temporary employment as a nurse and accepted two permanent

9   nursing positions. ECF No. 70 at 9.  Defendants cite *Blantz v. California Dep't of*

10  *Corr. & Rehab., Div. of Corr. Health Care Servs.,* 727 F.3d 917, 925 (9th Cir.

11  2013), for the proposition that "liberty interests protected by the Fourteenth

12  Amendment are implicated only when the government's stigmatizing statements

13  effectively exclude the employee completely from [his] chosen profession."

14  However, while liberty interests are indeed implicated when the government's

15  stigmatizing statements effectively exclude an employee from his chosen

16  profession, this is not the only means by which due process protections are

17  triggered. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573

18  (1972) (where the State seeks to bar forever an individual from public

19  employment, makes a charge of "dishonesty," or attaches a "stigma" to an

20

ORDER RE: PENDING MOTIONS ~ 24

employment decision, it must afford due process).[4]  Rather, an employee may also

claim the right to a name-clearing hearing if "1) the accuracy of the charge is

contested; 2) there is some public disclosure of the charge; and 3) it is made in

connection with the termination of employment or the alteration of some right or

status recognized by state law." *Llamas*, 238 F.3d at 1129. Thus, the Court finds

Defendants' argument unpersuasive in that it inaccurately states that King's claim

fails if he can find work elsewhere; that is not the standard.

### 2.  *"Public Disclosure"*

Defendants contest the "public disclosure" requirement of the Ninth

Circuit's elements for finding a due process violation, claiming that King "has

failed to identify a substantially false stigmatizing statement that was publicly

disclosed," and specifically arguing that "there is no evidence the termination letter

has been publicly disclosed or is available for public inspection." ECF No. 84 at 6-

---

[4] In *Blantz*, plaintiff argued that the she had been effectively barred from working

for the California Department of Corrections and Rehabilitation because of a poor

recommendation.  727 F.3d at 920. The Ninth Circuit held that the plaintiff's

liberty interest was in her profession as a nurse, not her placement with a particular

employer; thus, her allegations—under her own argument—were insufficient to

trigger due process protections. *Id*. at 926.

7. Accordingly, the Court here considers what statements form the basis of King's claim and whether they were "published" for the purposes of the due process analysis under *Llamas*. The parties refer throughout the briefing to three statements regarding King's termination: (1) the termination letter from GCHD; (2) the notification GCHD sent to the Nursing Care Quality Alliance regarding the reasons for King's termination; and (3) statements from GCHD official Dale Tuvey regarding King's unemployment benefits hearing.

First, King's termination letter, once placed in his file, may be considered published for due process purposes in a state—like Washington—where statutory provisions make personnel files subject to public records requests. *See Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004) ("absent expungement, placement of stigmatizing information in an employee's personnel file constitutes publication when the governing state law classifies an employee's personnel file as a public record."). The Washington Public Records Act ("PRA"), RCW 42.56, et seq., provides for the disclosure of such personnel files. *Cox v. Roskelley*, 359 F.3d at 1111. Thus, King's termination letter, presumably placed in his personnel file, is subject to public disclosure under the Public Records Act and is "published" for the purposes of the due process analysis.

The second alleged publication is GCHD's complaint to the Nursing Care Quality Assurance Commission. Morrow described the complaint as follows:

"Random testing of LTC nurses for reasonable suspicion of narcotic diversion relate to incorrect narcotic count. Test results were positive for Mr. King for opiates." ECF No. 73-27 at 3. Morrow further stated that they were "unable to prove actual patient diversion." *Id*. The Nursing Care Quality Assurance Commission appears to be a public entity. Thus, there is public disclosure for the purposes of the due process analysis.

Third, GCHD official Dale Tuvey submitted a letter regarding King's termination in a petition for review of the Employment Security Department's finding that King was entitled to unemployment benefits.  The letter stated in part that:

> We believe that the most likely explanation of what happened here and that is consistent with all the evidence in this case is that Mr. King did indeed take morphine from the bottle used for the patient for whom he cared, and that he did have high levels of morphine in his system that could only be explained by his having taken high levels of morphine, certainly more than contained in one Tylenol 3 tablet. The "near fatal" levels in his urine as described by Dr. McGee could only have been found in someone taking large quantities of the drug, possibly over a significant period of time.

ECF No. 73-30. Though the record does not state precisely how this letter was used, it appears to be submitted in the course of an appeal of an unemployment benefits hearing—a public or semi-public context.

Thus, all three events meet the "public disclosure" requirement.

///

ORDER RE: PENDING MOTIONS ~ 27

*3.  Whether the Statements Were Made in the Course of his Termination*

Defendants argue that the statements made during King's unemployment hearing were not made in the course of his termination, as required. ECF No. 70 at 11.

The Ninth Circuit held that:

> there must be some temporal nexus between the employer's statements and the termination. At some point, defamatory statements may become too remote in time from the termination to be considered made "in the course of the termination."

*Campanelli v. Bockrath*, 100 F.3d 1476, 1483 (9th Cir. 1996) (quoting *Hadley v. County of Du Page,* 715 F.2d 1238, 1246 (7th Cir. 1983)) ("seven- to nine-day interval between the termination date and the publication of the defendants' statements did not attenuate the temporal connection between the statements and the termination"). *See also Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331, 359 (D. Mass. 2011) ("an e-mail sent two months after an employee's termination cannot be characterized as temporally related to the termination, so as to be characterized as made 'in the course of termination.'"). However, the Eleventh Circuit has stated that it "hesitate[s] to set a temporal limit on the relationship between the alleged defamation and the other deprivation action." *Ray v. Tennessee Valley Authority*, 677 F.2d 818, 824 (11th Cir. 1982) (finding that six years was too attenuated).

ORDER RE: PENDING MOTIONS ~ 28

King was terminated on March 29, 2011, and his unemployment hearing was conducted on June 22, 2011. Pl.'s Statement of Facts, ECF No. 73 at 26, 31. On July 21, 2011, Dale Tuvey wrote the letter regarding the reasons GCHD terminated King. ECF No. 73-30. The Court agrees that nearly four months, from a purely temporal perspective, is not too attenuated for the temporal nexus between the statements and the termination required under *Campanelli*. Tuvey's statements related directly to GCHD's reasons for termination, and could certainly have had a serious impact on King's ability to access unemployment benefits. In that sense, the statements are closely linked to termination, and while somewhat temporally removed, are inherently linked to the termination action itself.

Defendant does not appear to contest the temporal nexus between the other two statements and King's termination. Because the termination letter was the document informing King of his discharge, it was clearly made "in the course of termination." Morrow's complaint to the nursing commission was made approximately eight days after King's termination, and directly concerned King's termination; thus, the temporal nexus is established with respect to that statement as well.

### 4.  *Whether the Stigmatizing Statements Were Substantially False*

GCHD next contends that a name-clearing hearing is only required if an employee alleges that the employer's statements were substantially false; thus, an

ORDER RE: PENDING MOTIONS ~ 29

1    uncontested statement cannot form the basis of a due process claim. ECF No. 70 at

2    9-10. Defendants claim that King says he was terminated for substance abuse and

3    drug diversion, but that GCHD never stated that King was discharged for drug

4    diversion or abuse. *Id.*  Rather, Defendants argue GCHD terminated King because

5    he tested positive for opiates.

6         The employee must contest the accuracy of the charge. *See Llamas,* 238 F.3d

7    at 1129.  Defendants additionally contend that the employee must allege that the

8    statement against him was "substantially false," ECF No. 70 at 9 (quoting

9    *Campanelli v. Brockrath*, 100 F.3d 1476, 1484 (9th Cir. 1995)). As the Supreme

10   Court put it, "if the hearing mandated by the Due Process Clause is to serve any

11   useful purpose, there must be some factual dispute between an employer and a

12   discharged employee which has some significant bearing on the employee's

13   reputation." *Codd v. Velger*, 429 U.S. 624, 627 (1977) (holding that an employee's

14   failure to assert that the statement at issue was "substantially false" was fatal to his

15   claim).

16         GCHD reported to the Nursing Care Quality Alliance that the long-term

17   care nurses were tested "for reasonable suspicion of narcotic diversion related to

18   incorrect narcotic count," and that King's test results were positive, though GCHD

19   was "[u]nable to prove actual patient diversion." ECF No. 73-27 at 3. Defendants

20   point out that the statements made by witnesses were true and thus distinguishable

ORDER RE: PENDING MOTIONS ~ 30

1   from the negative inferences that King suggests. ECF No. 70 at 11. [5] But GCHD's

2   contention that hospital staff never stated that King was terminated for drug

3   diversion is not dispositive of this issue. First, GCHD reported to the Nursing Care

4   Quality Assurance Commission that King was tested under reasonable suspicion

5   related to an incorrect narcotic count, King's test results were positive, and that

6   GCHD was unable to prove that there was an "actual patient diversion." While the

7   statements to the nursing board appear to be true, and King does not appear to

8   contest them, stated together there is at least question of material fact as to whether

9   they create an inference that King was terminated for drug diversion, as Plaintiffs

10  contend. The bare facts of suspected narcotic diversion and King's positive drug

11  tests results support a strong inference that King was terminated on suspicion of

12  drug diversion. The statement that GCHD was unable to prove actual diversion

13  [5] Defendants do not seem to be arguing that there would be insufficient stigma if

14  GCHD had in fact directly stated that it terminated King for drug diversion.

15  "Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate

16  a liberty interest, but less severe accusations must be analyzed on a case-by-case

17  basis, and allegations of mere incompetence or inability are not sufficient." *Blantz*

18  *v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.,* 727 F.3d

19  917, 925 (9th Cir. 2013).

20

1   does not negate the implication; in fact, it implies that GCHD simply could not

2   prove that King was the diverter. The plaintiff in *Stewart* did not contest the

3   accuracy of the dean's order to go get a mental evaluation, but took issue with the

4   implication of mental stability; in the same way, King contests the implication the

5   three statements create together, that he was terminated for suspected drug

6   diversion. *See Stewart v. Pearce*, 484 F.2d 1031, 1034 (9th Cir. 1973).

7        Again, "an employee's liberty interest is implicated if a charge of improper

8   conduct impairs the employee's reputation for honesty or morality." *Cox v.*

9   *Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004). A nurse's diversion of morphine

10  certainly implicates his "reputation for honesty or morality." Accordingly, King's

11  claim survives this argument.

12       *5.   Whether King Was Afforded an Opportunity to Clear His Name Prior to*

13           *Termination*

14       "[A] terminated employee has a constitutionally based liberty interest in

15  clearing his name when stigmatizing information regarding the reasons for the

16  termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d at 1110. "Failure to

17  provide a 'name-clearing' hearing in such a circumstance is a violation of the

18  Fourteenth Amendment's due process clause." *Id*. At-will employees are "entitled

19  only to a name-clearing hearing, not to a pretermination hearing concerning the

20  discharge itself." *Eklund v. City of Seattle Mun. Court*, 628 F.3d 473, 484, n.1 (9th

Cir. 2010). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'" *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573 (1972) (internal quotation and citation omitted).

Having found that Plaintiff meets the three-prong test for entitlement to a name-clearing hearing above, the Court must next consider whether Plaintiff has had a name clearing hearing. Plaintiffs contend that "GCHD did not provide Mr. King with any type of hearing, "name clearing" or otherwise." ECF No. 77 at 13. But in the very next sentence, Plaintiffs note that a meeting occurred on February 22, 2011, in which King was informed that his drug tests "showed near fatal levels of morphine," and King provided GCHD with his prescription for Tylenol #3. *Id*. Thus, the issue for the Court is whether King's pretermination meeting was a "name-clearing hearing" in satisfaction of constitutional due process requirements. It was not. Plaintiffs contend that King was not provided with the actual laboratory results of the test, nor had Dr. McGee certified his results as positive or negative at that time. *Id*. Without these, Plaintiffs claim, King could not demonstrate Dr. McGee's errors. *Id*. at 14. While King had notice that his urine drug screen would be discussed, he did not have the results from his drug test. ECF No. 73 at 17. As Plaintiffs correctly contend, without his test results, King could not adequately address the potential seriousness of the findings. Nor had GCHD at the time of the

meeting made the damaging statements that form the basis for King's need to clear his name. Without these, King certainly could not have had an opportunity to clear his name. Accordingly, Defendants' argument fails.

      6. *Whether King Should Have Requested a Post-Termination Name-Clearing Hearing*

      Defendants contend that King's due process claim should be dismissed because he failed to request a post-termination hearing. ECF No. 70 at 15. Defendants cite several cases from other circuits indicating that an employee's failure to take advantage of post-termination process that is available to him is sufficient to defeat his case. *See, e.g., Winkowski v. City of Stephen*, 442 F.3d 1107, 1110 (8th Cir. 2006) (holding that a government employee cannot recover for a due process violation where the employee simply failed to avail himself of the available post-termination procedure).

      These cases are distinguishable however, unlike here, a post-termination procedure was apparently available yet not invoked.  Defendant's statement of facts indicates that King tried to rebut the accusations against him verbally and in writing. ECF No. 69 at 23. He also requested a meeting with the nursing staff and Craigie regarding the "events and processes," which GCHD denied. *Id*. at 24. While King may not have used the phrase "name clearing hearing," that is not dispositive of his claim. There is no suggestion that GCHD offered him any other

meeting to address the charges after the statements giving rise to his claim of injury to his reputation.

Furthermore, Ninth Circuit law is clear that due process rights provide that a terminated employee be given notice and opportunity to be heard:

> The key component of due process, when a decisionmaker is acquainted with the facts, is the assurance of a central fairness at the hearing. Essential fairness is a flexible notion, but at a minimum one must be given notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." An individual must have an opportunity to confront all the evidence adduced against him, in particular that evidence with which the decisionmaker is familiar.

*Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 779-80 (9th Cir. 1982) (internal citations omitted). "The purpose of such notice and hearing is to provide the person an opportunity to clear his name." *Roth*, 408 U.S. at 573-574, n.12. Thus, the burden is on the government to "provide the person an opportunity to clear his name." The out-of-circuit cases Defendant cites indicate that Plaintiff must take advantage of the opportunities provided. Here, the undisputed evidence indicates that no such opportunity was provided to King; thus, he had no means to avail himself of it. For these reasons, Defendants' argument fails.

### 3. Qualified Immunity Defense

Defendants contend, in the alternative, that Craigie, Morrow, and Beehler are entitled to qualified immunity because their conduct did not violate clearly established constitutional rights. ECF No. 70 at 16.

Determining whether a defendant is entitled to qualified immunity involves a two-pronged analysis: (1) whether "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right" and (2) "whether the right was clearly established." *Lacey v. Maricopa Cnty.,* 693 F.3d 896, 915 (9th Cir. 2012) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan,* 555 U.S. 223, 235–236 (2009)). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier,* 533 U.S. at 201). The Court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236; *see also Mueller v. Auker,* 576 F.3d 979, 993–94 (9th Cir. 2009). "Only when an officer's conduct violates a clearly established constitutional right—when the officer should have known he was violating the Constitution—does he forfeit qualified immunity." *Id.*

In 2004, the Ninth Circuit held that a reasonable public official would have been aware that placing stigmatizing information in an employee's personnel file when state law mandates disclosure is unlawful absent a name-clearing hearing. *Cox v. Roskelley*, 359 F.3d at 1112. In *Cox v. Roskelley*, a termination letter placed in an employee's personnel file alleged improper conduct, and Washington law

provides for public record disclosure of personnel files. *Id*. As the Ninth Circuit explained, "by 1998 it was clearly established that such public disclosure meant that the procedural protections of due process applied," and Ninth Circuit cases "plainly informed" the defendant employer of their obligations. *Id*.

Here, *Cox v. Roskelley*'s very similar facts mandate a finding that GCHD officials are not entitled to qualified immunity for their actions. The *Cox v. Roskelley* opinion made clearer the rights it cited; an employee's entitlement to due process under analogous circumstances is even more firmly established now, nearly ten years later, and the burden of public employers to know the law just as compelling. Here, as in *Cox v. Roskelley*, GCHD officials terminated King via a termination letter alleging that he violated the drug policy handbook. And here, as in *Cox v. Roskelley*, hospital officials should have known that doing so triggered King's right to notice and an opportunity for a name-clearing hearing. Thus, they are not entitled to qualified immunity.

    4. <u>State Law Claims</u>

In addition to these constitutional claims, Plaintiffs also allege causes of action for breach of promise of specific treatment in specific circumstances and negligence. ECF No. 33 at 19. Defendants move for summary judgment, arguing that the cause of action for breach of promise of specific treatment is inapplicable

1    in this situation, and that Plaintiffs have not shown an agency relationship with Dr.

2    McGee that could give rise to vicarious liability. ECF No. 70 at 16.

3        *a. Breach of Promises of Specific Treatment*

4        Plaintiffs' Second Amended Complaint alleges that "GCHD has, by and

5    through the enactment of employment practices, policies, and procedures, created

6    an employment contract in fact between itself and Mr. King effectively creating an

7    atmosphere of job security and fair treatment with specific promises of specific

8    treatment in specific situations." ECF No. 33 at 17. These policies and procedures,

9    Plaintiffs contend, "created a specific procedure that was to be followed when

10   conducting drug tests on employees," but "GCHD did not follow its procedures

11   concerning drug testing of employees when it drug tested Mr. King." *Id*. at 18.

12   GCHD moves for summary judgment on this claim, arguing that King was an at-

13   will employee and the narrow "handbook exception" to the at-will employment

14   rule is inapplicable in this situation. ECF No. 70 at 19.

15       The Washington Supreme Court has held that:

16       if an employer, for whatever reason, creates an atmosphere of job security
         and fair treatment with promises *of specific treatment in specific situations*
17       and an employee is induced thereby to remain on the job and not actively
         seek other employment, those promises are enforceable components of the
18       employment relationship. We believe that by his or her unilateral objective
         manifestation of intent, the employer creates an expectation, and thus an
19       obligation of treatment in accord with those written promises.

20

1   *Thompson v. St. Regis Paper Co.*, 102 Wash. 2d 219, 230 (1984) (emphasis in

2   original). Despite this, *Thompson* court explained that employers are not always

3   bound by statements in employment manuals, including when they "specifically

4   state in a conspicuous manner that nothing contained therein is intended to be part

5   of the employment relationship and are simply general statements of company

6   policy." *Id. See also Swanson v. Liquid Air Corp.*, 118 Wash.2d 512, 530 (1992)

7   ("At a minimum, the disclaimer must state in a conspicuous manner that nothing

8   contained in the handbook, manual, or similar document is intended to be part of

9   the employment relationship and that such statements are instead simply general

10  statements of company policy."). "[A] disclaimer must be effectively

11  communicated to an employee in order to be effective." *Swanson*, 118 Wash.2d at

12  519. But "merely having an employee sign a disclaimer" will not necessarily

13  "render it effective in every instance." *Id.*at 530 (citing *Scholz v. Montgomery*

14  *Ward & Co.*, 437 Mich. 83 (1991) (recognizing that "once a disclaimer providing

15  employment at will is signed by an employee, excepting any subsequent

16  modification, the employee may be terminated for any, or no, reason."). "[T]he

17  crucial question is whether the employee has a reasonable expectation the

18  employer will follow the discipline procedure, based upon the language used in

19  stating the procedure and the pattern of practice in the workplace." *Nelson v.*

20  *Southland Corp.*, 78 Wash. App. 25, 32 (1995).

Here, as Defendants argue, GCHD disclaimed any intent to make the employment manual part of the employment relationship. ECF No. 70 at 19. On the signature page of the employee handbook, the penultimate paragraph states,

> I acknowledge that the handbook does not contain promises of specific treatment in specific situation and that my employment with the Hospital District is at will. At will employment means that either the District or I may terminate the employment relationship at any time for any reason or no reason at all.

ECF No. 66-2 at 2. King signed after the next paragraph. *Id*. Plaintiffs do not dispute that the disclaimer existed, or that King signed on the page where the disclaimer appeared. The disclaimers, set apart on a separate page—a page King signed—clearly indicate that GCHD disclaimed promises of specific treatment and reiterated King's at-will employment status. The language is plain and called out by its position on the "handbook receipt" page. Plaintiffs have not identified a pattern of practice of behavior at the hospital that would belie the plain language established the disclaimer. Accordingly, the Court grants Defendants summary judgment on this issue.

### b.  Vicarious Liability

Plaintiff's Second Amended Complaint also alleges that "GCHD owed King a duty to follow the accepted standard of care in performing the testing, conducting the analysis, and interpreting the urinalysis" and that "GCHD, as principal, is liable for the actions of its ostensible agent, Dr. McGee." ECF No. 33 at 18-19. GCHD

ORDER RE: PENDING MOTIONS ~ 40

argues that it is not vicariously liable for any negligence imputed to Dr. McGee, because there was no agency relationship between GCHD and the doctor. ECF No. 70 at 19.

"Before the sins of an agent can be visited upon his principal, the agency must be first established." *Matsumura v. Eilert,* 74 Wash.2d 362, 363 (1968). "An agency relationship may exist, either expressly or by implication, when one party acts at the instance of and, in some material degree, under the direction and control of another." *Stansfield v. Douglas Cnty.*, 107 Wash. App. 1, 17, 27 (2001) (citing *Matsumura,* 74 Wash.2d at 368). "The burden of establishing the agency relationship rests upon the party asserting its existence." *Id.* (citing *Hewson Constr., Inc. v. Reintree Corp.,* 101 Wash.2d 819, 823 (1984)). Under Washington law, an agency relationship is created, either expressly or by implication, "when one party acts at the instance of and, in some material degree, under the direction and control of another." *Hewson,* 101 Wash.2d at 823. Consent and control are the essential elements of the relationship. *Stansfield*, 107 Wash. App. at 17. "'Control is not established if the asserted principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract. Instead, control establishes agency only if the principal controls the manner of performance....'" *Uni-Com Northwest, Ltd. v. Argus Publ'g Co.,* 47 Wash.App. 787, 796-97 (1987) (quoting *Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc.,*

ORDER RE: PENDING MOTIONS ~ 41

28 Wash.App. 669, 674 (1981)). Generally, a principal is not vicariously liable for the acts of an independent contractor. *Phillips v. Kaiser Aluminum & Chem. Corp.*, 74 Wash. App. 741, 749 (1994) (citing *Epperly v. City of Seattle,* 65 Wash.2d 777, 785 (1965)). An owner who employs an independent contractor is already liable to all third persons for his or her own negligence and for negligence in the hiring of the independent contractor. *Tauscher v. Puget Sound Power & Light Co.*, 96 Wash. 2d 274, 281-82 (1981).

Here, there is simply no indication that Dr. McGee was GCHD's agent. Plaintiffs acknowledge that QCL conducted the drug testing, that QCL hired OHS to interpret the drug tests, and that OHS hired Dr. McGee as a medical review officer to interpret the drug tests. Pl.'s Statement of Facts, ECF No. 73 at 13-14. The only facts Plaintiffs cite in support of their contention that Dr. McGee was GCHD's agent is that Dr. McGee corresponded with QCL, OHS, and GCHD; that Dr. McGee offered opinions to GCHD regarding the toxicology of King's drug test; that GCHD provided Dr. McGee with information prior to his testimony at the June 22, 2011, unemployment benefits hearing; and that Dr. McGee testified at the hearing. *See* Pl.'s Statement of Facts, ECF No. 73 at 14-15. None of these facts suggest that GCHD exercised any control over Dr. McGee's performance of his duties.  Rather, all facts indicate that GCHD hired a company to drug test, which in turn hired another company to interpret that test, which in turn hired a doctor to

interpret the test. There is no suggestion that Dr. McGee was anything other than an employee or independent contractor of another company, providing services to GCHD.

Nor does the Court find persuasive Plaintiffs' argument that Dr. McGee had apparent authority.

> Apparent agency occurs, and vicarious liability for the principal follows, where a principal makes objective manifestations leading a third person to believe the wrongdoer is an agent of the principal. Restatement, (Second) of Agency § 267 (1957). The doctrine is intended to protect third parties who justifiably rely upon the belief that another is the agent of a principal. The doctrine has three basic requirements: the actions of the putative principal must lead a reasonable person to conclude the actors are employees or agents; the plaintiff must believe they are agents; and the plaintiff must, as a result, rely upon their care or skill, to her detriment.

*D.L.S. v. Maybin*, 130 Wash. App. 94, 98 (2005).

Here, as above, Plaintiffs fail to explain how Dr. McGee's appearance at the unemployment benefits hearing led King to believe that he was GCHD's agent, or how King relied on such a belief, taking place, as it did, after his termination. Accordingly, this argument fails as well, and Defendants' motion for summary judgment on the issue of vicarious liability is granted.

MOTION TO STRIKE

Defendant GCHD also moves to strike Plaintiffs' Fact Nos. 108, 111, 130, and 131, on grounds that these facts, and the opinion of the expert supporting them are contrary to law and incorporate inadmissible legal opinions. ECF No. 86 at 1,

ORDER RE: PENDING MOTIONS ~ 43

5. Because the expert Dr. Lantsberger has no legal training and is not qualified to provide legal opinions, Defendant argues, these facts should be stricken and all testimony that constitutes or incorporates opinions on law should be excluded. *Id.* at 5-6.

Here, the Court has not relied upon the statements of fact to which Defendant objects. Accordingly, Defendant's motion is denied as moot.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant Terrence McGee, M.D., and Jane Doe McGee's Motion for Summary Judgment (ECF No. 60) is **DENIED**.

2. Defendants GCHD, Blaine Beehler, Michele Beehler, Andrew Craigie, and Barbara Craigie's Motion for Summary Judgment (ECF No. 70) is **DENIED in part and GRANTED in part** as follows:

   a. Defendants' request for summary judgment on Plaintiffs' claim that the drug testing violated the Fourth Amendment is **GRANTED**.

   b. Defendants' request for summary judgment on Plaintiffs' Fourteenth Amendment due process violation is **DENIED**.

   c. Defendants' request for summary judgment for the hospital officials on qualified immunity grounds is **DENIED**.

ORDER RE: PENDING MOTIONS ~ 44

    d.  Defendants' request for summary judgment on Plaintiffs' claim of specific treatment under the employee handbook is **GRANTED**.

    e.  Defendants' request for summary judgment on Plaintiffs' claim of vicarious liability for Defendant McGee's actions is **GRANTED**.

3.  Defendants' Motion for Summary Judgment (ECF No. 63) is **TERMINATED** because it is superseded by Defendant's corrected motion for summary judgment at ECF No. 70.

4.  Motion to Strike Statement of Facts (ECF No. 86) is **DENIED as moot.** The Court will consider motions to exclude testimony at the time stated in the scheduling order.

**5.**  Motion to Shorten Time to Hear Motion to Strike (ECF No. 97) is **GRANTED**.

6.  Motion to Expedite (ECF No. 96) is **GRANTED**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** May 1, 2014.



THOMAS O. RICE
United States District Judge

ORDER RE: PENDING MOTIONS ~ 45